OLIVER MONETTE *et.als.*, Appellants, *vs.* OLIVER CRATT *et. al.*,
Respondents.

ERROR TO·THE DISTRICT COURT OF WABASHAW COUNTY.

A demurrer to a complaint stating as the ground thereof, that the complaint does not state facts sufficient to constitute a cause of action, is sufficient in form, without specifying the particulars in regard to which the insufficiency consists.

Where. under such general ground, certain specifications are made in the Court below, and upon which the demurrer is argued, the party will not be confined to those specifications in this Court, but may urge others which are applicable under the general ground.

The Land Departments of the United States are the proper tribunals in which to try disputes between owners of Half-breed scrip. in regard to location of the same.   And where the c·mplaint shows that the matter in dispute has been submitted to, and decided by those tribunals their decision will be regarded as final and conclusive, and the action cannot be entertained by the State Courts.

The following is the decision of the Court below upon the demurrer to the complaint :

The complaint in this action shows that the Plaintiff Jennie Cratt, and the Defendant, Pauline Monette, are mixed bloods of the Dakotah or Sioux nation of Indians, referred to and provided for in the 9th Article of the Treaty made and conclude.l at Prairie du Chien, July 15th, 1830, (7 *U. S. Stat. at large, p.* 328), and in the act of Congress entitled "An act to authorize the President of the United States to cause to be surveyed, the tract of land in the Territory of Minnesota, belonging to the Half-breeds or mixed bloods of the Dakotah or Sioux nation of Iudians, and for other purposes," approved July 17th, 1854. *United States Statutes at large, p.* 304.

That the Plaintiff, Oliver Cratt is the husband of Jennie Cratt, and the Defendant Oliver Monette is the husband of Pauline Monette.

That said Jennie Cratt and Pauline Monette in pursuance of the provisions of said act of Congress, relinquished to the Government of the United States, all their right, title and interest in and to said Half-breed reservation and have received scrip from the Government of the United States, each for

480 acres, to be located, &c., in accordance with the provisions of said act of Congress.

That the lot of land in dispute contains 48.80 acres and that said scrip was issued to the Half-breeds, in pieces of 40, 80 and 160 acres only.

The Defendant demurs to the complaint. The only point made by the demurrer is this.

In a tract or subdivision of land sought to be located by scrip, where, in the area of the tract, there is a small excess over the scrip, whether the tract can be located by the scrip, by paying for the excess in money.

By the issue made by this demurrer the Plaintiffs affirm, and the Defendants deny that such location can be so made.

By the 9th Article of said Treaty of Prairie du Chien, the above mentioned reservation was made for the Half-breeds of the Dakotah or Sioux nation of Indians.

By the 10th Article of said Treaty it is provided :

"That the President of the United States may hereafter assign to any of said Half-breeds, to be held by him or them, in fee simple, any portion of said tract, (Half-breed Reservation aforesaid), not exceeding a section of six hundred and forty acres to each individual," &c.

The next legislation on the subject is found in the aforementioned Act of Congress, approved July 17th, 1854, (10 *United States Statutes at large*), by which Act it is provided:

"That the President be and is hereby authorized to exchange with the Half breeds     *     *     *     who are entitled to an interest therein for the tract of land lying on the west side of Lake Pepin     *     *     *     (the said Half-breed tract), and for that purpose he is hereby authorized to cause to be issued to such persons     *     *     *     certificates or scrip for the same amount of land to which each individual would be entitled in case of the division of said land *pro rata* among the claimants, which said certificates or scrip may be located on any lands within said reservation, not now occupied by actual and *bona fide* settlers of the Half-breeds or mixed bloods, or such other persons as have gone into said Territory by authority of law, or upon any other unoccupied land," &c.

The same act further provides that the President shall cause to be taken an enumeration of said Half breeds ; and that from and after the passage of said act, he shall be authorized to have the land within said reservation surveyed and exposed to public sale.

The next legislation on the subject, is found in the 4th section of the act of Congress, entitled, "An Act making appropriations for the current and contingent expenses of the Indian Department, and for fulfiiling treaty stipulations with various Indian tribes for the year ending July 30th, 1855, and for other purposes. Approved July 31st, 1854." 10 *U. S. Stats. at large.*

Said 4th Section is in the following words :

Sec. 5. (4). " And be it further enacted, that the President of the United States be and he is hereby authorized and required to be fulfilled, the stipulations of the 9th and 10th articles of the Treaty with the Sacs, Foxes and other tribes of Indians, concluded on the 15th of July, 1830, (the Treaty of Prairie du Chien aforesaid,) by causing said reserved tracts to be surveyed and allotted to the persons properly entitled to the same, in fee simple, in such manner and under such rules and regulations as he may prescribe ; and to defray the expenses of the same there be and is hereby appropriated the sum of $10,922.29." This section is qualified by the second section of an act entitled :

" An Act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian Tribes, for the year ending June 30, 1856, and for other purposes," approved March 3, 1855, (10 *U. S. Statutes at large, p.* 699,) which said second section of the last mentioned act provides :

That section 4 of said act approved July 31, 1854, shall not be so construed as to interfere with the said first mentioned act (approved July 17, 1854). These are the only laws which I find, having any bearing upon the point in controversy, and from them it is apparent that the President has the power, and it was his duty to cause to be fulfilled the stipulations of said Treaty, and that in doing so he should not proceed in a manner controvening the provisions of said act of Congress, of July 17, 1854.

The law, it will be observed, only provides generally what shall be done, and leaves to the President to direct the manner in which it shall be done.    The outlines are prescribed by law, the minutiæ left in his discretion.

And the President in giving directions as to the manner in which any small excess in government subdivisions or any residuary tracts should be paid for, acted within the letter and authority of the law.

On the 21st day of March, A. D. 1857, the Commissioner of the General Land Office issued and sent instructions to the proper officers of the local land offices in the districts in which the reservation lies, directing said officers where there should be a small excess in the area of the location, over the scrip, to receive pay for the excess, in money.

This instruction of the Commissioners is to be considered as the instruction of the President.  *De Lafayette Wilcox vs. John Jackson*, 13 *Peters U. S. Rep.*, 498.

Therefore I think on this ground alone the demurrer must be overruled.

But even if the acts of the Commissioner of the General Land Office, and of the Local Land Office were not strictly and technically legal, none but the government would be permitted to call them in question. 12 *Wheat. U. S. Rep.*, *p.* 211.

The demurrer is overruled, with leave to Defendants to answer within twenty days after service of a copy of the order overruling demurrer.


Points and Authorities for Appellants.


It appears from the complaint in this action that the rights of the parties herein have been adjudicated upon and determined by the Land Department of the United States Government, and decided against the Respondents, and in favor of the Appellants.    That decision is final.

By the instructions of the Commissioner of the General Land Office, dated March 21, 1857, authority is specially given to the Register and Receiver of the Land Office at Red

Wing to hear and determine all the questions upon which the right of the half-breeds to locate their scrip depends.

The adjudication before the Land Department is equally as conclusive, as it would be before a judicial tribunal. *United States vs. Arredondo*, 10 *Curtis U. S. R.*, 340, *and cases there cited; see also, p.* 355, *same book; White vs. Cootsworth*, 2 *Selden N. Y. R., p.* 137, 143; *Embery vs. Conner*, 3 *Comst. R.*, 523; *Cow. & Hill's Notes to Phil. Ev., part* 2, *p.* 31; 3 *Will. N. Y. R.*, 599; *State vs. Bachelder*, 5 *Minn. R.*, 223; *Edwards' Lessees vs. Dorby*, 7 *Curtis R.*, 129.

The complaint shows that the land in dispute consists of a legal subdivision established by the United States Surveys, and containing 48 80-100 acres of land. It is therefore an entirety. The locater must take the whole or no part of it. He cannot subdivide it to suit his own convenience, or the size of his scrip. He cannot locate his scrip on a part of a lot, and leave the rest unlocated.

This is the well known and universal practice of the government. It has never been disputed, and it is too plain to need argument. *See instructions of Com'rs of General Land Office, March* 21, 1857; *Act of Congress, April* 24, 1820; *U. S. Stat. at large, vol.* 3, *p.* 566; *same, vol.* 4, *p.* 503.

These statutes show the general law to be that the public lands must be taken according to the subdivisions established by the government survey, and the rule is not changed by the Act of July 17, 1854, where the scrip, (as in this case,) is located upon land that was surveyed at the time of the location.

This is the general system of legislation upon the subject, and it may be taken into view in order to aid the meaning of the act of July 17, upon this point. *Church vs. Crocker*, 3 *Mass. R.*, 17, 21; *Holbrook vs. Holbrook*, 1 *Pick.*, 248, 423.

" Lands sold under the United States survey pass according to the descriptions of the legal subdivisions, whether these subdivisions contain the legal quantity or not, more or less." *Fulton vs. Doe*, 5 *How. Miss.*, 571, *cited in U. S. Digest, vol.* 2 *of Sup., p.* 667; *Brown vs. Clements*, 3 *How. U. S. R.*, 650; *McLean, J., in Croghan's Lessees vs. Nelson*, 15 *Curtis R.*, 586, 592.

Points and Authorities for Respondent.

I.—Before examining the questions really at issue in this case, it may be proper to call the attention of the Court to the first point urged by the counsel for the Appellants which is that *the rights of the parties to this controversy have been already adjudicated.* That this point should be, or can be urged in this case, is equally a matter of surprise.

We submit that no such question *can* arise. The demurrer interposed does not raise this question, nor was it either directly or indirectly passed on by the Court below. (See demurrer and decision.) This Court held in the case of *Babcock & Hollinshead vs. Sanborn & French,* 3 *Minn., p.* 141, that it "will not entertain questions which have not received the actual decision of the tribunal from which they come." This ruling has been in terms affirmed since. See *Daniels vs. Bradley,* 4 *Minn., p.* 158, and has become the settled practice of the Court after a just examination of the powers and authority conferred upon this Court.

II.—We dissent entirely from the doctrine sought to be enforced, and claim, that the position is most clearly untenable under the decisions of this Court, and not sustained by reason, or authority. It is admitted to be right and sound policy, that the decision of the Register and Receiver in a preemption case should be conclusive upon all questions judicially submitted to them. This Court has laid down and established the rule in the case of *Minnesota vs. Batchelder,* 5 *Minn., p.* 223, and in the case of *Leech vs. Rauch,* 3 *Minn., p.* 448. Policy requires that when a tribunal having jurisdiction has decided a question involving the stability of land titles, that such decision should stand. Congress in conferring the right of pre-emption and fixing the requirements of the pre-emptor, in terms provided the tribunal, and defines and directly confers the jurisdiction. The law says "that the proof shall be made to the satisfaction of the Register and Receiver." Under the law therefore, a question is judicially submitted to them and they try the case in the first instance —their decision is then upon appeal reviewable by the Com-

missioner of the General Land Office, and lastly upon like appeal, by the Secretary of the Interior. The law in terms confers judicial authority, and defines the manner of its exercise.

Not so with Sioux Half-breed scrip and its location, for here neither does the necessity for a judicial tribunal exist, nor is the jurisdiction conferred, nor is the tribunal created either in terms or indirectly; nor are the powers, duties or the manner of their exercise defined.

*First.*—The law of Congress, approved July 17, 1854, (*vol.* 10, *U. S. Stats. at large, p.* 304,) and this alone with two explanatory sections, in the Indian appropriation bills for 1854 and 1855, (*vol.* 10, *pages* 332 *and* 699,) make up the entire legislation upon this subject.

*Second.*—hTe scrip issued (See Schedule "A,") is unlike any similar issue of warrants or scrip locatable on Government land before that time granted; carrying upon its face full and complete directions as to the mode and manner of its location, and how and where, and when it could be used. As between the Government and the scrip holder, the President may make certain and specified regulations; but as between scrip holders themselves, or between scrip holders and third parties, the law is entirely silent—not even by an obscure intimation affording a chance to guess, how disputes arising in these latter cases shall be decided, except by Courts of general jurisdiction.

From these most patent facts, the necessary logical inference is that in the absence of other authorized tribunals all their disputes must be settled by the Courts. Will it be presumed that jurisdiction is given by implication to the Register and Receiver, or the Commissioner of the General Land Office, or Secretary of the Interior? These officers are one and all ministerial officers of defined and limited power, and in such officers judicial jurisdiction can never be presumed. They can go no farther than the law allows, for they are its creatures. The law gives them no authority. The scrip is silent, and " the power to hear and determine a cause not existing, jurisdiction does not exist." 10 *Curtis U. S. Rep., p.* 322.

2 *Selden*, 137, 3 *Comstock*, 522, and other authorities cited

by Appellant's counsel, assert when a court of competent jurisdiction has once decided a case, then it is *res adjudicata*. This is begging the whole question. `We deny the jurisdiction. The Secretary of the Interior, not an officer of general judicial powers, must acquire that jurisdiction somehow.

As to the general principles involved in and decisive of this case, we need only refer the Court to its decision in the case of *The State vs. Batchelder*, 5 *Minn.*, on *pages* 237-38, *and cases there cited*; 18 *Curtis' U. S. Rep.*, *p.* 159. *In* 7 *Curtis*, *p.* 601, the Court says that "if the Register and Receiver, (Secretary of the Interior in this case,) act without authority, their judgments are nullities, not voidable but simply void." Also, 2 *Curtis*, *p.* 187, decides that jurisdiction may be assailed collaterally even (this is between the parties), for the purpose of ascertaining whether the matter is subject to the jurisdiction of the Court passing sentence. As between parties, there can be no doubt on this point. *Williamson vs. Berry*, 17 *Curtis*, 669; *Rogers vs. Dill*, 6 *Hill*, 451.

J. N. MURDOCK, and MASTERSON & SIMONS, Counsel for Appellants.

W. W. PHELPS, with S. L. CAMPBELL, Counsel for Resp'ts.

*By the Court*—ATWATER, J.—The first objection urged by the Appellants before this Court, is that this case, as appears from the complaint is *res adjudicata*. The Appellants demurred to the complaint in the Court below, assigning as the general ground of demurrer, that the complaint did not state facts sufficient to constitute a cause of action. Under this general ground, were several specifications, but not the objection here specifically urged. And it is claimed by Respondents, that the objection not having been made in terms in the court below, cannot here be considered.

The objection here stated by Appellants, if it appears upon the face of the complaint, would be appropriately urged under the general ground specified in the demurrer. It has been repeatedly held that a general demurrer to a pleading, that it does not contain facts sufficient to constitute a cause of

action or defence, is sufficient, without further specifications. 3 *How. Pr. R.* 280; 4 *ib.*, 226; 7 *ib.* 316; 8 *ib.* 159; 1 *Sel.* 359. This principle has been, impliedly at least, recognized in *Brown vs. Manning,* 3 *Minn.,* 37, and in the *State vs. Batchelder,* 5 *Minn.,* 223. In the latter case, there was a general demurrer to the reply, for the reason that it did not state facts sufficient to constitute ground for a reply. That case was decided on the ground that the subject matter was *res adjudicata.*

If a party under such general ground of demurrer, does make certain specifications, we do not think he is necessarily confined in his argument to those specifications, but may urge any which are pertinent to the general objection. Under the general objection the pleader is advised what he is to meet, and should be prepared to sustain his pleading against any specification that may be urged under this general ground. And especially against a specification of the kind here urged, which, if well taken, must be fatal in any stage of the case at which it is raised. We may therefore appropriately consider this objection here, and we do so with the less hesitation in this case, from the fact that the Respondents have elaborately argued the objection upon the merits, and the Court is fully advised of the reasons to be urged against the views of the Appellants herein.

By the treaty of Prairie du Chien, (7 *U. S. Stats. at large, p.* 328), a reservation of certain lands on the west side of lake Pepin, (embracing the lands in dispute), was made for the benefit of the mixed bloods of the Dakota or Sioux nation of Indians. By the 10th Article of said treaty it is provided, "that the President of the United States may hereafter assign to any of said Half-breeds, to be held by him, or them, in fee simple any portion of said tract, (Half-breed reservation aforesaid), not exceeding a section of six hundred and forty acres to each individual," &c. Under this act, it does not appear that any steps were taken to allot these lands individually to parties entitled to them.

On the 17th of July, 1854, an act of Congress was approved, (10 *U. S. Stats. at large, p.* 304), providing "that the President be, and he is hereby authorized, to exchange with the

Half-breeds or mixed bloods of the Dacotah or Sioux nation of Indians, who are entitled to an interest therein, for the tract of land lying on the west side of lake Pepin and the Mississippi river, in the Territory of Minnesota, which was set apart for their use and benefit, by the ninth article of the treaty of Prairie du Chien ; and for that purpose he is hereby authorized to cause to be issued to said persons, on the execution by them, or by the legal representatives of such as may be minors, of a full and complete relinquishment by them to the United States of all their right, title and interest, according to such form as shall be prescribed by the Commissioner of the General Land Office, in and to said tract of land or reservation, certificates or scrip for the same amount of land to which each individual would be entitled in case of a division of the said grant or reservation *pro rata* among the claimants—which said certificates or scrip may be located upon any of the lands within said reservation, not now occupied by actual and *bona fide* settlers of the Half-breeds or mixed bloods, or such other persons as have gone into said Territory by authority of law, or upon any other unoccupied lands subject to pre-emption or private sale, or upon any other unsurveyed lands, not reserved by Government, upon which they have respectively made improvements."

By the third section of the act it is provided, " that from and after the passage of this act, the President is authorized to have the lands within the said reserve surveyed and exposed to public sale at the Land Offices for the districts in which said lands may lie, according to the boundaries of the several land districts recently established by Congress, in the same manner as other public lands."

On the 31st of July, 1854, an act was approved, entitled, "An act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending July 30, 1855, and for other purposes." By the 4th section of this act (10 *U. S. Stats. at large p.* 332), it is provided "that the President of the United States be and he is hereby authorized and required to cause to be fulfilled, the stipulations of the 9th and 10th articles of the treaty with the Sacs, Foxes and other tribes

of Indians, concluded on the 15th of July, 1830, (the Treaty of Prairie du Chien aforesaid,) by causing said reserved tracts to be surveyed and allotted to the persons properly entitled to the same, in fee simple, in such manner and under such rules and regulations as he may prescribe ; and to defray the expenses of the same there be and is hereby appropriated the sum of $10,922.20."

By another act making appropriations, &c., approved March 3, 1855, (10 *U. S. Stats. at large, p. 699, sec.* 2), it was provided that section four of said act approved July 31, 1854, shall not be so construed as to interfere with the said first mentioned act (approved July 17, 1854). These several acts constitute all the legislation on the subject by Congress, to which we find any reference in the papers presented to this Court.

It will be observed that by the terms of the act of July 17th, 1854, before any of these Half-breeds were entitled to receive scrip, they must have relinquished to the United States all their right, title and interest, in and to said reservation. The land which this scrip entitled these parties to receive, belonged to the Government of the United States, at the time of their application to locate the same. And, we may here remark, as a general proposition, in passing, that the United States Government has always claimed and enforced the right of determining the time and manner in which its lands should be disposed of, and appointing or selecting the tribunal which should decide all disputes between individuals in regard to the same. Whether such disposition be by pre-emption, bounty warrants, at public or private sale, the policy of the Government has been the same, and steadily adhered to, and we are not aware of any case in which Congress has permitted the legislative or judicial authority of a State, within which government lands may lie, to enact laws, or make regulations for the primary disposition of the soil.

In the act authorizing a State Government for Minnesota, the several propositions therein submitted to the convention, are stated to be on the condition, that the said convention which shall form the constitution of said State shall provide by a

clause in said constitution, or an ordinance, irrevocable without the consent of the United States, that said State shall never interfere with the primary disposal of the soil within the same by the United States, or with any regulations Congress may find necessary for securing the title in said soil to *bona fide* purchasers thereof. In view of this general policy of the Federal Government, therefore, to permit no interference of any department of the State Governments in the disposition of the soil belonging to the United States, if it be claimed that the location of lands under this scrip constitutes an exception, we should naturally expect to find, either express authority conferred upon the State Courts to adjudicate upon disputes arising upon the location of this scrip, or, if the law be silent in this regard, at least something in the nature of the case, rendering it necessary, or peculiarly appropriate for the State Courts to exercise jurisdiction in the premises.

The main object of the act of July 17, 1854, appears to have been to get rid of the Indian or Half-breed title to the reservation on the west side of Lake Pepin, and to bring the same into market. It is explicitly provided that the Half-breeds should receive a certain quantity of scrip, upon executing a complete relinquishment to the United States, of all their right, title and interest in and to said reservation, in such form as the Commissioner of the General Land Office should prescribe. It is also provided *where* this scrip may be located, but as to anything further in regard thereto, the law is silent, it not being deemed, perhaps, as important to the interests of Government to prescribe the rules and regulations for the locating this scrip, as those for the extinguishment of the Indian title. It is then further provided, that from and after the passage of the act, the President is authorized to have the lands within the said reserve surveyed and exposed to public sale, at the Land Offices for the districts in which such lands may lie, in the same manner as other public lands. Thus far we find no authority granted to any tribunal to determine or adjudicate upon disputes arising upon the location of this scrip, nor indeed, any place where, or manner in which the same may be located, provided. But in regard

to the lands themselves it is provided that they shall be surveyed and exposed to public sale at the Land Offices for the districts in which said lands' may lie, in the same manner as other public lands. So far as the subject matter of the action, or the lands upon this reservation are concerned, there is not only nothing in the act, showing that Congress intended to confer an exceptional jurisdiction over them, but the language of the last section, with regard to their disposition, would seem clearly to show that they were to be governed by the same rules that apply to other public lands.

But the act of July 31, 1854, supplied the omission in the act of July 17th, with reference to the location of this scrip, by providing that the reserved tracts should be surveyed and allotted to the persons properly entitled to the same, in fee simple, in such manner and under such rules and regulations as the President may prescribe. This act conferred full authority to make this scrip available in the hands of the owners thereof, upon the President, by empowering him to make such rules and regulations as he might prescribe for the allotment of the lands, and necessarily incident thereto, the location of the certificates or scrip. It was, however, subsequently provided, by the act of March 3d, 1855, that said section four of the act of July 31st, should not be so construed as to interfere with the first section of the act of July 17, 1854. Subject to this restriction, the President has entire control of the matter, and we are to look to the acts of that functionary to ascertain what further was done in the premises.

The next action on the part of the Government which the records disclose, is the issuance of certificates or scrip, with instructions annexed to and accompanying or forming a part of the same, regarding the location thereof, under the hand and seal of George W. Mannypenny, Commissioner, bearing date the 24th day of November, 1856. By these instructions the owner of the scrip was entitled to locate at the proper land office, the number of acres designated by the scrip, "upon any of the lands within said reservation, that was not occupied on the 17th day of July, A. D., 1854, by actual and *bona fide* settlers of the said Half-breeds or mixed bloods, or such other persons as had at that date, or prior thereto, gone

into said territory by authority of law, or upon any other un-occupied lands subject to pre-emption or private entry," &c. It is thus at length provided *where*, and upon what lands this scrip may be located.

But inasmuch as by the terms of these instructions, there were certain lands upon which this scrip could not be located, and inasmuch as the scrip itself could not specify what lands were occupied by the persons designated in the instructions, but such facts must be determined by proof *aliunde*, it must almost as a matter of course occur, that disputes would arise upon this question, between claimants for the same tract of land, and hence the necessity for a tribunal with authority to settle these disputes.   This necessity was recognized and pro-vided for, in the circular from the Commissioner of the Gen-eral Land Office, to the Register and Receiver of the land offices within the districts in which these lands lie.   By this circular, particular instructions are given to the officers as to the location of this scrip, and it is provided that "to consti-tute a Half-breed or mixed blood an actual and *bona fide set-tler*, within the meaning of the statute, it *must be shown by proof satisfactory to you*, that he was an occupant by personal inhabitation within said reservation, at or before the pas-sage of the act of July 17th, 1854," &c.   These instructions bear date (as is stated in the papers) the 21st of March, 1857. That these instructions are to be considered the acts of the President, and therefore have the binding force of law, see 13 *Peters' U. S. Rep.*, 498 ; 16 *ib.*, 291 ; 1 *How., U. S.*, 293. For the purposes of this case, however, it is immaterial whether the authorities sustain the position or not, since both parties admit that these instructions have the binding force of law, and that they are to be received as the acts of the President, done in pursuance of the authority conferred upon him, by the statutes above referred to.

We have here then, a tribunal established by law, to wit, the land officers of the districts in which the lands in ques-tion lie, upon which jurisdiction is conferred, to hear and de-termine disputes with reference to the location of this scrip. These officers, for this purpose, are clothed with judicial pow-ers ;—they are to determine, by proof satisfactory to them,

certain facts, as the actual occupation of the land, (and inci-
dent hereto, of the improvements), the time when occupied,
and as to who are included by the persons named, who have
" gone into said 'territory. by authority of law." The com-
plaint shows that this tribunal has heard and determined the
dispute between these parties. That is, such is the reasonable
intendment from the pleading, although the fact is not stated.
in express terms. It is alleged that Jennie Cratt, on the 4th
day of April, 1857, made an application to locate said scrip,
No. 67 A, for forty acres on said lot 4, of said section 29, in
compliance with the law of July 17, 1854, and the instruc-
tions of the General Land Office, at the Land Office then at
Red Wing, Minnesota, and at the same time tendered and
filed said piece of scrip with the officers, &c. It is also al-
leged that Pauline Monette, on the 10th of September, 1857,
tendered for location a piece of her scrip, No. 88 C, for eighty
acres, at the same Land Office, and prosecuted her application
through the departments of the General Land Office, and that
the same was, on the 17th day of March, 1860, ordered by the
Secretary of the Interior to be located on said lot four in dis-
pute. That letters patent were issued on said entry to said
Pauline Monette, by the United States. It being the duty of
the Land Officers to determine the rights of the parties under
these applications, the legal presumption is that such duty
was performed, in the absence of any allegation to the con-
trary. In whose favor the decision of these officers was made,
or upon what grounds, does not appear, and is not perhaps
here material.

But inasmuch as it does not appear from the complaint, in
whose favor the local officers decided the conflict between
these parties, but that the Secretary of the Interior ordered
the scrip of Appellants to be located on the land in dispute,
and as it is claimed that he had no authority whatever in the
premises, it may be necessary to go a step further, and con-
sider whether a decision by that officer is conclusive in the
premises. Neither the acts of Congress above referred to,
nor the instruction of the Commissioner, provide in express
terms for an appeal from the decision of the Register and
Receiver. But we cannot avoid the conclusion, that such was

the intent of the law under which this scrip was located.    In the instructions or circular above referred to, it is provided that " at the close of each month, the Register and Receiver will make a separate official return of scrip located, with all the papers on file, connected with such location," &c.    Were the decision of the local officers final in the premises, such proceeding would seem wholly unnecessary, and the only apparent object for requiring it, is to enable the Commissioner and Secretary to review the proceedings, should either party require it, as in like cases by pre-emption.    But again, this scrip is locatable upon lands subject to pre-emption.    By the act of September 4th, 1841, it is provided that there shall be an appeal from the decision of the Register and Receiver to the Secretary of the Treasury (since changed to Commissioner of the General Land Office and Secretary of the Interior,) upon all questions touching the right to pre-empt.    In case of a conflict, therefore, between the owner of scrip and a pre-emptor, for the same piece of land, the latter, in case of a decision adverse to him, would have the right of appeal ; and it is absurd to suppose the law intended to give such right to one party in a litigation, but deny it to the other.    But if the holder of scrip enjoys the right of appeal in one case, then we must conclude he does in all, since it would be no less absurd to grant the right to contestants with one class, and refuse it to those with another, and especially where precisely the same kind of questions are litigated.

Again, the fact that the Land Departments at Washington have actually adjudicated upon the rights of these parties, is a consideration not without weight in this connection.    The remark of the counsel for Respondents, that the fact that the Secretary of the Interior, (including necessarily the action of the Commissioner of the General Land Office,) undertook to decide the case without conferred authority so to do, proves nothing, is doubtless true, as a general proposition, and as stated, may be true as applied to this case.    But it is not admitted in this case, as assumed in the proposition, that the Commissioner and Secretary had no authority to act, and that is a fact which we are to endeavor to determine from all the circumstances of the case.    In general it may be admit-

ted that the action of a ministerial officer under a certain law, would not be the proper evidence or authority to prove the true construction of the law, or that such action was authorized by the law. But in this case, the officers acting under the law, are themselves the law making power, so far as prescribing the rules and regulations necessary for the location of this scrip is concerned. It can scarcely be doubted but that provision for appeal would fall within such regulations as are included in the act, and the question is, whether such provision has been made. The intent of the law is to be carried out, where it can be ascertained, and where the law making power itself has declared the intent, it would seem to be the best evidence which could be obtained of the true meaning of the law. Had the instructions of the Commissioner expressly provided that an appeal should lie, from the decisions of the district land officers, to the Commissioner of the General Land Office, and Secretary of the Interior, there can be no doubt but that the rights of the parties hereto, would be subject to such regulation. The President being authorized to make such regulation, (through the Commissioner or otherwise,) it would be binding upon the parties. In case of doubt therefore, whether the laws relating hereto, intended to allow such appeal, we think the action of the Commissioner and Secretary in the premises, may properly be considered in determining the intent of the law. And from the considerations above stated, we think the determination of the Secretary of the Interior, as stated in the complaint, was not unauthorized by law, and is binding upon the parties.

We have thus considered the authority of the Secretary of the Interior to make the determination in question, though the objection of the Respondents apply equally to the decision of the District Land Officers upon the question. The claim is that the Courts are the only authorized tribunals to settle disputes arising on the location of this scrip. We think we have shown that this position is unsound, and that a tribunal has been created to settle disputes of this nature, and as the complaint shows that such tribunal has adjudicated upon the rights of the parties, such adjudication must be held final and conclusive by this Court, as we have heretofore held

in *Leech vs. Rauch*, 3 *Minn.*, 448, and in the *State vs. Batch-elder*, 5 *Minn.*, 223. We there held, that in all matters which by law are confided to the examination and decision of the United States Land officers, they act judicially, and their decisions are as final as those of other Courts. In this case no question of fraud is raised, (as against the title of Monette,) but the decision is impeached solely on the ground of the want of authority in the officers making it. Before dismissing the case however it may be proper to remark upon one or two errors into which the counsel for the Respondents has fallen, and not above adverted to.

It is claimed that the scrip in question is unlike any similar issue of warrants or scrip locatable upon government land before that time granted; carrying upon its face full and complete directions as to the mode and manner of its location and how and where, and when it could be used. This is an error. The scrip itself only shows at what office and upon what lands it may be located. But the scrip does not, and manifestly could not show upon its face, whether the lands actually selected by the owner of the scrip, upon which to locate the same, fell within the description named in the scrip. Whether the lands selected were or were not occupied on the 17th day of July, 1854, by actual or *bona fide* settlers of the half-breeds, or mixed bloods, or such other persons as had, at that date, or prior thereto, gone into said Territory by authority of law, could, of course, not be determined by any inspection of the scrip, but solely by proof *aliunde*. And hence the necessity of a tribunal to determine these facts, before the scrip could be properly located.

The Counsel for the Respondents claims that the Courts have original and exclusive jurisdiction in disputes arising upon the location of this scrip ; that the title of the Respondents is wholly void, as having been granted by a Department having no authority in the premises. If this be true, the title of the land is still in the United States, and the right is claimed of resorting to the State Courts to obtain title to land belonging to the United States. We are aware of no law giving the State Courts jurisdiction of such action, nor of any process by which their decrees could be enforced, were they

to assume jurisdiction in the premises. In the Federal authority alone is vested the power of the primary disposition of lands belonging to the United States, and it is only where it appears that the title has actually passed out of government in some form, that any ground is laid for the State Courts to adjudicate upon the title. Where, by the claim or showing of the Plaintiff himself, the title of the premises in dispute is in the United States, we can conceive of no possible state of facts that would authorize or justify the State Courts in granting the relief here claimed, to wit, that "the Plaintiff is entitled to the ownership and possession of the premises, with a full and perfect title thereto."

This view disposes of the case and renders it unnecessary to examine the other points raised by the demurrer. The decision of the Court below overruling the demurrer is reversed.